[Cite as *Miller v. Miller*, 2021-Ohio-4573.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Myla R. Miller, | : | |
| Plaintiff-Appellee, | : | No. 18AP-877 |
| | | (C.P.C. No. 16DR-1690) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Craig D. Miller, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 28, 2021

**On brief**: *Wolinetz, Horvath & Brown, LLC, Barry H. Wolinetz, Dennis E. Horvath*, and *Eric M. Brown*, for appellee. **Argued**: *Barry H. Wolinetz.*

**On brief**: *The Behal Law Group, LLC, Robert J. Behal*, and *DeAnna J. Duvall*, for appellant. **Argued**: *Robert J. Behal.*

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

NELSON, J.

{¶ 1} The trial court's October 19, 2018 Divorce Decree now comes before us after action on the appeal was delayed for some extended time to permit settlement discussions and resolution of a dispute over whether a final settlement had in fact been reached. *See, e.g.,* trial court's September 30, 2020 Judgment Entry (concluding that there had been no post-decree binding settlement, and wisely encouraging continued efforts at negotiation); June 21, 2021 Appellant's Brief at 4 (briefing here had "remained tolled due to ongoing negotiations of the parties"); August 26, 2021 Appellee's Brief at 2 (appeal delayed "pending party negotiations"). The appeal finally proceeded to argument on November 10, 2021 between counsel for appellant Craig D. Miller and counsel for appellee Myla R. Miller over

issues involving the division of marital property and the orders of child and spousal support.

{¶ 2}  Appellant's Brief accurately explains that "[t]he major dispute between the parties during the course of the five-day trial was over the value of Appell[ant]-Husband's optometry business [Eye Columbus, LLC] and his income generated therefrom." Appellant's Brief at 7; *see also* Divorce Decree at 40 ("the Court is painfully aware that the vast disparity in the parties' fair market values for Eye Columbus, LLC was *the* reason this case proceeded to trial") (emphasis in original).  In the end, the trial court—despite finding that "*both* parties' financial valuations of Eye Columbus, LLC are flawed in certain respects," *see id.* at 10 (emphasis in original)—adopted the business valuation of $960,000 advanced by Myla Miller's expert, without revision, and allocated marital assets accordingly, *see id.* at 21-22.  The trial court also adopted the view of Myla Miller's expert in attributing executive salary to Craig Miller based on reported national averages of officer compensation in the optometry industry applied as a percentage to her findings of gross income for Eye Columbus, LLC, *see id.* at 24-25 (coming to a three-year average attributed salary of $297,485); largely on that basis, the trial court ordered Craig Miller to pay child support of $1,140.51 per month, *id.* at 25, and ordered him to pay non-modifiable spousal support of $5,500.00 per month for four years, *id.* at 33.

{¶ 3}  Craig Miller puts forward three assignments of error:

> [I.] The trial court erred * * * and abused its discretion by inequitably dividing marital property;
>
> [II.] The trial court erred * * * and abused its discretion by improperly imputing income to Appellant-Husband for purposes of calculating child and spousal support, creating an inequitable distribution of income, contrary to the law of Ohio; [and]
>
> [III.] The trial court erred * * * and abused its discretion by granting Appellee-Wife spousal support, contrary to law, after her request for such was withdrawn.

Appellant's Brief at 1.  As the assignments suggest, we do review the trial court's rulings on these matters for abuse of discretion, looking only to whether they were unreasonable, arbitrary, or unconscionable.  *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983)

(adding at 218 that a "trial court in any domestic relations action has broad discretion in fashioning an equitable division of marital property").

{¶ 4} To support his first assignment of error, Craig Miller argues the trial court erred by adopting the conclusions of his now ex-wife's business valuation expert Courtney Sparks-White, who, he submits, had improperly disregarded ("backed out") $658,460 in discounts accorded to insurance payors as reflected in the company bookkeeping for 2016 (when he had switched to a system of recording the full amount charged, then less the discount, rather than simply recording the bottom-line amount received, as in earlier years). *See* Appellant's Brief at 16-17 (also noting that the effect of that decision, as averaged over the four-year 2013-2016 period under review, inflated yearly gross cash flow by roughly $160,000); *see also* Tr. Vol. I at 123-27; 322-26.

{¶ 5} Myla Miller counters this concern by arguing that the expert was justified in suspecting that the switch in accounting methodologies was spurred by Myla Miller's 2016 divorce filing, and also that the expert had offset her having added the discounts back into revenues through "other assumptions that she [then] made in her valuation report," so that there was a "relative insignificance of the magnitude of this particular discount"; she submits that not adding that billed and then discounted amount back into the calculus as revenue "would only reduce the valuation of Appellant's practice [from $960,000] to $875,000." Appellee's Brief at 5-6, 15-16 (also urging that trial court was entitled to adopt Ms. Sparks-White's view in toto because she was "more credible" than Craig Miller's witnesses); *see also* Divorce Decree at 11, fn. 14 (citing to the $875,000 testimony), 6 (citation to testimony regarding possible revenue shifting), 7 (citing testimony that other adjustments partially compensated for addition of the discounted portions of billings).

{¶ 6} The transcript of Ms. Sparks-White's examination at trial does reflect that she added the discounts figure back into her calculations as company revenue annualized for 2016 and then worked into the four-year average. *See, e.g.*, Tr. Vol. I at 123-24, 127. And whereas company books for 2013 to 2015 showed "discounts and adjustments" at $0, $46,000, and $0, respectively, that figure for 2016 (after the company apparently switched to reflecting the billed amount and also then the discounts taken off that amount, rather than just showing bottom line receipts, *see, e.g., id.* at 322-26 [Craig Miller expert discussing 2016 switch from net to gross numbers]) soared to $658,000. Ms. Sparks-White

acknowledged that the figure was "immensely out of line with any prior numbers"; asked why that was the case, she replied she did not know. *Id.* at 124. Nor did she explore the question. *Id.* at 125 (Q. "Did you inquire as to why that was the case?" A. "I did not ask that specific question."). After adding in as revenue what Craig Miller submits is in effect phantom income (the insurance payor discounts applied to the as-billed number), Ms. Sparks-White arrived at after-tax adjusted earnings for 2016. *Id.* at 128-29. She did testify that were she not to add the discounts figure back as 2016 revenue, her valuation of the business would go from approximately $960,000 to something on the order of $875,000 (after then "play[ing] around" with other assumptions, too). *Id.* at 149, 154; *see also id.* at 156 (because not including the $658,000 in discounts as revenue would have yielded a negative cash flow for a business that had significant fixed assets, she would have altered "other assumptions" in order to get to that hypothetical $875,000 figure). Even that modified $875,000 figure would have been reached only after adopting assumptions she did not make in arriving at the $960,000 figure after including the $658,000 "discounts" number as revenue for 2016. *Id.* at 156.

{¶ 7} Because the first and second assignments of error are most productively analyzed in tandem, we turn at this point to Craig Miller's arguments in support of his second assignment. He submits that in adopting the conclusions of Ms. Sparks-White, the trial court improperly imputed income to him as an officer of his company. Appellant's Brief at 18-26. The trial court, he argues, did not make what he says was a required finding of underemployment (in not taking from the company a salary commensurate with his position). *Id.* at 20-21 (citing *Bruno v. Bruno*, 10th Dist. No. 04AP-1381, 2005-Ohio-3812; also citing *Misleh v. Badwan*, 9th Dist. No. 24185, 2009-Ohio-842, a child support case, for proposition that statutory imputation analysis applicable to child support calculations also applies to calculation of spousal support not at issue there); *compare* Divorce Decree at 28 (incorporating analysis of "Incomes/Earning Abilities" from child support section of decision into assessment of spousal support). And, Craig Miller says, the finding went against the historical evidence of his actual earnings and was based on national averages (of salaries as a percent of gross company income) that did not account for geographic fluctuations, length of time in business, and the like. Appellant's Brief at 21-22.

{¶ 8} We note that Craig Miller's arguments in his briefing (as opposed to the wording of his second assignment of error) are focused on the trial court's order of spousal support and not on its child support order. We also note that those arguments go beyond the terms of the assignment (as premised on "improperly imput[ed] income") in complaining that the trial court established the level of spousal support as non-modifiable. *See id.* at 25-26.

{¶ 9} Myla Miller does not contest that if the trial court had imputed income to Craig Miller, it would have had to make an express finding of voluntary underemployment pursuant to analysis of statutory factors. *See* Appellee's Brief at 17 (assuming the point). Rather, she responds that "[t]he trial court did not impute income to Appellant and, instead, determined a proper annual income figure." Appellee's Brief at 17 (emphasis in heading omitted). The trial court's task was made more difficult, she recites, by company accounting and compensation method modifications made during the course of litigation, *id.*, and the trial court in her view was justified in relying on the expert testimony of Ms. Sparks-White, *id.* at 18-19.

{¶ 10} In finding that Craig Miller's annual income from Eye Columbus, LLC alone "should be established at $269,548" and adjusted up to $289,026 for 2017, rather than working from the base yearly salary he paid himself of $76,923, the trial court again adopted Ms. Sparks-White's analysis wholesale. Divorce Decree at 23-24. While that expert "readily concedes that her 'officers' compensation' figures * * * are reflections of average rates of compensation paid to optometrists nationwide (as reported by [an entity called] BizMiner)," the trial court wrote, "[s]he credibly defends her use of BizMiner as an industry standard for financial analysis benchmarks – which is particularly applicable in situations, such as this, where the 100% owner enjoys the privilege of setting his own level of compensation." *Id.* at 24.

{¶ 11} Ms. Sparks-White did testify that in calculating what yearly income to attribute to Craig Miller, she used the 12.6 percent figure that BizMiner reported as the average officer compensation for optometrists taken as a percentage of a business's "gross revenues." Tr. at 110, 113. She used that figure, and adjusted it up by another 3.5 percent to account for any "personal goodwill" that Craig Miller had in the business, *id.* at 113, while acknowledging that BizMiner nationwide average does not differentiate by the length of

time a business has been in operation, where it is located, or other factors particular to the business. *Id.* at 111; *compare* R.C. 3119.01(C)(17)(a)(v) (factors for imputing "potential income" for child support purposes include "[t]he prevailing wage and salary levels in the geographic area in which the parent resides"). Asked, "[a]nd that [attributed salary] number is not derived from your analysis of how much money Dr. Miller or any officer of the corporation or the LLCs in this case actually made, is it?", she was clear: "It is not. It is an industry average adjusted." *Id.* at 109-10. More precisely, when asked to confirm that the "numbers * * * don't have anything to do with the amount of money Dr. Miller was actually able to take out of the business or actually did take out of the business," she responded: "That's correct. It's the normalized compensation number." *Id.* at 114.

{¶ 12} Both with regard to valuation of the company (with consequent implications for the division of marital assets) and to assessment of Craig Miller's "[i]ncome[]/[e]arning [a]bilit[y]" (relying solely on the decision's child support discussion, *see* Divorce Decree at 28), the Divorce Decree is transparent that the trial court based its determinations not on a discrete block by block evaluation of the evidence, but on a global evaluation of which of the parties' competing experts was the more credible. Thus, with regard to valuation of Eye Columbus, LLC, the trial court was explicit: "It has never been this Court's practice to 'split the baby' by averaging the two parties' value proffers. Instead, this Judge has typically relied upon the expert opinion it determines is best, most fair, [and] most well-reasoned. There is no compelling reason to deviate from that practice in this case." Divorce Decree at 11. The trial court adopted precisely the same approach in establishing Craig Miller's income: "In short, the Court finds Ms. Sparks White's income analysis *more* compelling and credible. *Accordingly*, after considering the testimony, evidence and mandates set forth in applicable sections of the Ohio Revised Code, the Court hereby finds that the amount calculated * * * is just, appropriate and serves the best interest of the parties' minor children." *Id.* at 25 (emphasis added).

{¶ 13} The trial court had good reason in the record to find Ms. Sparks-White's bottom-line assessments more persuasive than the figures offered by Craig Miller's (lone court-approved) expert. And trial courts have broad discretion to accept any or all of an expert's testimony in determining the proper division of marital property and setting levels of child and spousal support. *See, e.g., Martin v. Martin*, 18 Ohio St.3d 292, 294 (1985) ("a

trial court in any domestic relations action has broad discretion in fashioning an equitable division of marital property"); *Badescu v. Badescu*, 10th Dist. No. 18AP-947, 2020-Ohio-4312, ¶ 29 (as factfinder, trial court may choose to believe or disbelieve any witness). But the ultimate task of the trial court was not simply to pick which one of two experts it favored overall, but to come to proper and properly supported results. Here, not only was there a very wide chasm between the experts' opinions (with Myla Miller's expert Ms. Sparks-White having set the value of the business at $960,000, for example, as opposed to the $222,000 figure offered by Craig Miller's expert, *see* Divorce Decree at 5), but the trial court also perceived that Ms. Sparks-White's valuation of Eye Columbus, LLC was "flawed in certain respects." Divorce Decree at 10.

{¶ 14} The trial court did not explain *what* flaws it saw in Ms. Sparks-White's analysis (and flaws, for example, in counting $658,000 in insurance write-offs as part of one year's revenues, even if deemed close enough for government work, also would have spilled over into the equation calculating Craig Miller's annual income in terms of national compensation averages as a percentage of gross revenues). Nor did the trial court provide a sense as to the overall *magnitude* of the flaws it identified (beyond the conclusion that the flaws in Ms. Sparks-White's assessment were less egregious than the flaws in the approach of Craig Miller's expert). Simply noting that the expert's analysis was "flawed" (albeit less flawed than the competing expert's) did not excuse the trial court, in our view, from the need then to evaluate whether those unspecified flaws counseled reexamination or revision of any of the expert's bottom line numbers. Case law cited by the trial court does not suggest otherwise. *See Duke v. Duke*, 12th Dist. No. CA94-04-009, 1995 Ohio App. Lexis 167, *3-4 (Jan. 23, 1995) (affirming trial court's averaging of estimates from "both real estate experts testifying at trial," with both experts found unbiased and competent); *Kelch v. Kelch*, 9th Dist. No. C.A. 4285, 1988 Ohio App. Lexis 2070, *3 (May 25, 1988) (trial court "took into consideration all the evidence" and did not abuse its discretion in allocating property).

{¶ 15} We do not now hold that the trial court is barred from relying on any part of Ms. Sparks-White's testimony in determining what the equitable division of property and the correct and reasonable support levels should be. We do not now preclude any particular outcome for those assessments. But we do hold that such an inquiry, focusing on arriving at proper results under the law as opposed simply to reaching a conclusion about which

expert was *more* credible or offered the *less* flawed analysis, should be the trial court's aim. Thus, for example, we recently have repeated that " '[a] trial court's assignment of an asset's value must be based upon competent, credible *evidence*,' meaning evidence that is both competent, credible evidence of value and a rational basis upon which to establish the 'value.' " *Habtemariam v. Worku*, 10th Dist. No. 19AP-47, 2020-Ohio-3044, ¶ 61 (emphasis added), quoting *Warren v. Warren*, 10th Dist. No. 09AP-101, 2009-Ohio-6567, ¶ 15. Merely finding that an expert, however her analysis, is more competent and credible than an opposing expert, does not fully complete the necessary evaluation. *Compare* Divorce Decree at 10 (making the point, supportable only in so far as it goes, that "Defendant's proffered valuation (i.e., $222,000) is more flawed than Plaintiff's (i.e., $960,000) * * *").

{¶ 16} Again, we do not know what aspects of Ms. Sparks-White's analysis the trial court found to be flawed. But a trial court practice designed to adopt without modification and as an all or nothing proposition the results of a concededly flawed expert analysis simply because countervailing analysis was more flawed seems to us—as applied in this particular context involving the testimony we have referenced—an abuse of discretion as unreasonable and arbitrary. We therefore will remand this matter to the trial court so that it may assess the evidence and formulate its views more precisely on what the proper allocation and appropriate and reasonable support results should be, and we sustain Craig Miller's first and second assignments of error to that (relatively limited) extent.

{¶ 17} Craig Miller contends under his third assignment of error that the trial court erred by granting spousal support after Myla Miller had withdrawn her request for such an award. *See* Appellant's Brief at 27 (citing the provision of R.C. 3105.18(B) that spousal support may be awarded "upon the request of either party," and also citing *Pomeroy v. Pomeroy*, 11th Dist. No. 2005-A-0032, 2006-Ohio-5833). Myla Miller responds that she did not withdraw her request, urging in part that an argument for enhanced child support "rather than spousal support" is not a formal withdrawal of a spousal support request. Appellee's Brief at 19-21 (quoting written closing argument at 7-8).

{¶ 18} The parties spar over whether Myla Miller withdrew her request at the outset of the trial, when her counsel advised the trial court that, depending on the testimony, she would "[m]aybe" pursue her request. Tr. at 18. That statement preserved and did not

withdraw the request, and the trial court did not rule out spousal support at that juncture. *See id.* (trial court advises that "at some point in time, you need to figure out whether it's worth it to argue your position for spousal support or let that go").

{¶ 19} In her amended closing argument, filed after the close of evidence, Myla Miller told the trial court that "assuming an allocation of the available income on a 55/45 basis, no spousal support is required." April 20, 2018 Amended Closing Argument of Myla Miller at 7. Later in the document, after requesting that the trial court order Craig Miller to make certain cash payments to Myla Miller "immediately," and before asking for child support of $3,826.67 per month (more than three times what the trial court ultimately awarded), Myla Miller stated: "Neither party should pay spousal support to the other." *Id.* at 12-13.

{¶ 20} That arguably contingent statement does not rise to the level of unequivocal "withdrawal" of a request for spousal support that was discussed in *Pomeroy*, where at the outset of trial "appellee's attorney specifically informed the court that [without regard to other claims] appellee was not requesting spousal support." *See* 2006-Ohio-5833, at ¶ 10-16. Moreover, *Pomeroy* turned in significant part on the fact that the husband there "specifically relied upon [the wife's] assertion that the spousal support request was withdrawn," and therefore did not present evidence on that score. *Id.* at ¶ 17; *see also id.* at ¶ 18 (reliance on "specific withdrawal" caused husband not to present evidence on the issue, and thereby distinguished that case from *Riegel v. Riegel*, 3d Dist. No. 14-98-06, 1998 Ohio App. Lexis 4977 (Sept. 30, 1998), where court found generalized counterclaim sufficient to satisfy requirements of R.C. 3105.18(B)). Here, by contrast, the statement at issue came in Myla Miller's written closing argument and did not influence either the evidence presented or Craig Miller's own written closing (which was submitted roughly simultaneously with Myla Miller's).

{¶ 21} On these facts, we do not find the trial court was precluded from awarding any spousal support at all to Myla Miller. Additionally, because we remand this case to the trial court for further consideration of the evidence relating to the business valuation (for asset allocation purposes) and to the annual income attributed to Craig Miller (for child support and any spousal support purposes), we find Craig Miller's third assignment of error

no longer ripe at this stage of proceedings.  For these reasons, we overrule the third assignment of error.

{¶ 22} Having sustained Craig Miller's first two assignments of error to the extent described and having overruled his third assignment of error, we remand this matter to the trial court for further proceedings consistent with this decision.

*Judgment reversed in part*
*and cause remanded.*

KLATT and BEATTY BLUNT, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____