[Cite as *Oakes v. Oakes & Leadwise, Inc.*, 2024-Ohio-6051.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| SHERY B. OAKES | : | |
| | : | |
| Appellant/Cross-Appellee | : | C.A. No. 30023 |
| | : | |
| v. | : | Trial Court Case No. 2020 DR 00761 |
| | : | |
| DAVID C. OAKES | : | (Appeal from Common Pleas Court- |
| AND LEADWISE, INC. | : | Domestic Relations) |
| | : | |
| Appellees/Cross-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 27, 2024

. . . . . . . . . . .

JOHN D. SMITH & ELIZABETH R. MURRAY, Attorneys for Appellant/Cross-Appellee

TERRY S. POSEY, JR. & L. BRADFIELD HUGHES, Attorneys for Appellees/Cross-Appellant

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Shery B. Oakes appeals from the trial court's final judgment and decree of divorce terminating her marriage to appellee David C. Oakes and dividing their assets and liabilities. Shery contends the trial court erred in failing to provide security for David's

nearly $29 million financial obligation to her and in valuing several businesses and the marital residence.

{¶ 2} In a cross appeal, David claims the trial court erred in valuing Leadwise, Inc., which was the largest of the businesses, at $115.7 million and in valuing his ownership interest in the business at more than $80 million. He also contends the trial court erred in treating the parties' residence as marital property even though it had been gifted to an irrevocable trust and in treating investments in wine, watches, jewelry, and art as personal property subject to division by coin flips. Finally, David asserts that the trial court erred in ordering him to pay Shery nearly $29 million to equalize division of their assets and liabilities.

{¶ 3} With regard to Shery's appeal, we conclude that the trial court erred in not ordering some security for David's financial obligation, which is payable to her over seven years. The trial court did not err, however, in failing to value David's "founder's option," which gave him a right to repurchase all outstanding Leadwise shares. The trial court also erred in valuing the marital residence at $5 million absent evidentiary support for that valuation. We see no error, however, in the trial court's valuation of the Villages of Winding Creek Homeowners Association and Design Homes and Development Company, two other businesses that were marital property. Finally, we agree with Shery that the trial court erred in valuing Brantwood Development, LLC, which also was a marital-property business.

{¶ 4} As for David's cross appeal, we find a remand necessary for the trial court to make additional findings regarding the value of Leadwise. We also conclude that the trial

court erred in awarding Shery real estate owned by an irrevocable trust, a separate entity that was not a party to the divorce case, and in directing David personally to facilitate transfer of the property to her. We see no error, however, in the trial court's coin-flip disposition of the wine, watch, jewelry, and art collections.

{¶ 5} For the reasons set forth more fully below, the trial court's judgment will be affirmed in part, vacated in part, and reversed in part. The case will be remanded for the trial court to make additional findings and to correct the errors identified herein.

## I. Background

{¶ 6} The parties married in 1980 and have three adult children. During the marriage, David and Shery started a number of successful ventures and acquired substantial assets. Shery filed a complaint for divorce in October 2020 on the grounds of incompatibility. The trial court held a divorce hearing that included many days of testimony and produced a voluminous record. One of the primary issues concerned the value of David's majority interest in Leadwise, an integrated national real-estate construction company with numerous subsidiaries operating under its umbrella. In addition to Leadwise, the parties disputed the value of several other marital businesses, the value of the marital residence, and whether the residence constituted a marital asset subject to equitable division given that Shery had conveyed it to an irrevocable trust during the marriage. The parties additionally disputed the proper disposition of wine, watch, jewelry, and art collections.

{¶ 7} Based on the evidence presented, the trial court resolved each of the foregoing issues. To equalize the division of marital assets and liabilities, the trial court

ordered David to pay Shery $28,952,397.50 over a seven-year period. The trial court ordered annual payments with interest, but it did not require any security for David's financial obligation. Shery timely appealed, advancing six assignments of error, and David cross appealed, advancing four assignments of error.

## II. Shery's Appeal

{¶ 8} Shery's first assignment of error states:

**THE TRIAL COURT ERRED IN FAILING TO PROVIDE SUFFICIENT SECURITY FOR THE FUNDS NEEDED TO EQUALIZE THE DIVISION OF MARITAL PROPERTY.**

{¶ 9} Shery contends the trial court abused its discretion in failing to require any security for David's nearly $29 million financial obligation to her. For his part, David argues that security is not required in every divorce case and that the trial court did not err in failing to require it here.

{¶ 10} When dividing the parties' assets and liabilities, the trial court allowed David to retain his interest in Leadwise, Inc., which was by far the most valuable asset. To equalize the division of all marital assets and liabilities, the trial court ordered David to pay Shery $28,952,397.50 over seven years. Despite Shery's request, the trial court declined to require him to provide any security for this obligation.

{¶ 11} On appeal, the parties agree that a trial court has discretion whether to order security for a payment obligation arising from a marital-property division. *Palazzo v. Palazzo*, 2016-Ohio-3041, ¶ 16 (9th Dist.); *Berger v. Berger*, 2015-Ohio-5519, ¶ 99 (11th Dist.). As a result, we apply abuse-of-discretion review. An abuse of discretion implies the

existence of an unreasonable, arbitrary, or unconscionable attitude. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A decision is unreasonable if no sound reasoning process supports it. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 12} Upon review, we see no sound reasoning process to support the trial court's failure to require any security for David's nearly $29 million financial obligation payable over seven years. Near the end of its written decision, the trial court acknowledged Shery's request for some sort of security, including potentially a promissory note, security agreement, liens, guarantees, stock-transfer restrictions, or a requirement for immediate payment if David sells stock in Leadwise. The trial court denied Shery's request, stating: "[T]he court will not order that David individually or as Trustee be restricted from transferring any shares of Leadwise. It has not been demonstrated that David would do anything to prevent Shery from receiving her full share of the marital assets nor does the court believe that David would do anything to diminish the value of Leadwise, Inc."

{¶ 13} Even if we assume that David would not intentionally fail to pay Shery nearly $29 million, she persuasively argues on appeal that he controls Leadwise and has discretion to transfer the company's shares in ways that could undermine his repayment obligation. She notes too that future events—including among other things the possibility of David's death, a remarriage, business problems, claims by creditors, and the fact that his Leadwise shares are held in trust—could complicate her ability to collect on his financial obligation to her.

{¶ 14} In our view, the trial court acted unreasonably, and thereby abused its

discretion, in failing to require any security for David's $28,952,397.50 debt to Shery. This obligation is exponentially larger than the award in any of the cases cited by either party. Particularly given the size of this award, the seven-year duration of David's payment obligation, and the nature of his control over Leadwise, the trial court was obligated to order some form of security for the debt. While its failure to do so constituted an abuse of discretion, we will leave it to the trial court and the parties to address the nature of that security on remand. Shery's first assignment of error is sustained.

{¶ 15} The second assignment of error states:

**THE TRIAL COURT ERRED IN VALUING LEADWISE, INC.**

{¶ 16} Shery challenges the trial court's decision to assign no value to a Leadwise stock option owned by David. The option, which was known as the "founder's option," granted David the right to repurchase shares that had been awarded to other shareholders. Exercising the option required him to pay 1.25 times book value to repurchase outstanding shares.

{¶ 17} Although David could exercise the founder's option at any time for any reason, he testified that its purpose was to empower him to remove an employee-shareholder who was not a good fit. Shery argues that the founder's option was marital property because David acquired it during the marriage and it necessarily had value. Shery's expert, Alan Duvall, valued the option at $22 million. Duvall arrived at this figure by subtracting 1.25 times book value from his estimate of fair-market value for all Leadwise shares that David did not own.

{¶ 18} In its written opinion, the trial court largely adopted Duvall's opinion

regarding Leadwise's valuation. However, the trial court declined to assign any value to the founder's option. It noted that David never had exercised the option. The trial court also found it "highly unlikely that the option would ever be exercised." For that reason, the trial court declined "to include in Mr. Duvall's valuation his estimated value of the Founder's Option."

{¶ 19} On appeal, Shery insists that the founder's option was a marital asset and that it had some value even if David was unlikely to exercise it. She contends David's own rebuttal expert, Rebekah Smith, suggested that the founder's option had a value of more than $5 million. Under these circumstances, she insists that the trial court abused its discretion in failing to assign any value to the option.

{¶ 20} Upon review, we find Shery's argument to be unpersuasive. Although David was entitled to exercise the option for any reason, he characterized it as a "damage control" tool. According to David, its purpose was to enable him to rid the company of someone who did not meet expectations and who was "negatively affecting the financial well-being of the company." David opined that exercising the option for any other reason would harm Leadwise because it would damage the existing culture of trust and the family atmosphere within the company. David testified that he never had considered exercising the option, which he obtained in 2013, and that he had no intention of doing so.

{¶ 21} The trial court was entitled to credit David's testimony that he only would exercise the founder's option to rid the company of a bad employee. The trial court reasonably concluded from David's testimony that he was "highly unlikely" ever to exercise the option. David's rebuttal expert, Rebekah Smith, testified that accepted

option-valuation methodology considers the likelihood of an option ever being exercised. Given the trial court's determination that David was "highly unlikely" ever to exercise the founder's option, we believe the trial court acted within its discretion in declining to assign any value to the option. In the abstract, the value of the option might have been the difference between 1.25 times book value and the higher fair-market value of the Leadwise shares David did not own. But if David never exercised the option, he never would realize that value. The trial court was not obligated to ignore this reality.

{¶ 22} Contrary to the suggestion in Shery's brief, we note too that David's rebuttal expert did not value the founder's option at more than $5 million. Rather, applying Duvall's methodology for the sake of argument, Smith corrected what she perceived as errors in his calculations and arrived at a value of $5,355,000. Smith later made clear, however, that she did not agree with Duvall's methodology because he failed to include "a likelihood analysis" of the option never being exercised.

{¶ 23} Given the non-traditional nature of the founder's option, David's testimony about its narrow purpose, and his lack of intent to exercise it, we see no abuse of discretion in the trial court's failure to assign any value to the option. Accordingly, the second assignment of error is overruled.

{¶ 24} The third assignment of error states:

**THE TRIAL COURT ERRED IN VALUING THE MARITAL HOME.**

{¶ 25} Shery contends the trial court erred in using cost basis to value the parties' residence rather than relying on evidence of fair market value. Shery, a licensed realtor, contends that she opined during the divorce hearing that the marital home was worth

between $3.8 million and $4 million. According to Shery, she based this opinion on two appraisals that were not admitted into evidence. For his part, David did not present evidence of the home's current value. He did introduce evidence, however, establishing that the home's cost basis was approximately $5 million when it was built. Shery claims the trial court erred in adopting cost basis rather than her market-value opinion. We review the trial court's valuation determination for an abuse of discretion. *Gregory v. Gregory*, 2007-Ohio-4098, ¶ 39 (2d Dist.).

**{¶ 26}** During the divorce hearing, Shery described the marital residence as being "dysfunctional," "odd in the marketplace," and "a unicorn in the city." At one point, she opined that "you can't appraise it." She nevertheless hired two appraisers to determine its value. When pressed for her own valuation opinion, she admitted that she was "not quite sure what it would sell for." She explained that there might not be "many buyers out there" and that "[i]t could be worth far less than we expected." She mentioned, however, that the appraisers had valued the home at $3.8 million and $4.0 million respectively. Later in her testimony, she referred to the residence as a "money pit." When asked whether it was worth less than the parties had invested, she characterized the answer to that question as "a market decision." However, she then expressed certainty that "the value is less than what we paid at the time."

**{¶ 27}** In the divorce decree, the trial court valued the marital home at $5 million. In its supporting written decision, the trial court reasoned:

> David presented evidence the value of the marital home is $5,000,000.00. Shery presented evidence that the value of the marital home

is $3,900,000.00. The court finds the value of the marital home is $5,000,000.00 for purposes of offset. Shery will retain title to the Lot free and clear of any claim of David. David shall undertake all steps necessary to facilitate the title transfer to Shery.

{¶ 28} On appeal, Shery contends the trial court abused its discretion in adopting the home's cost basis as the fair market value. She notes that she provided evidence of the home's current fair market value and that the trial court provided no explanation for adopting the cost basis.

{¶ 29} Upon review, we find Shery's argument to be persuasive. David did not testify that the fair market value of the home was $5 million at the time of the divorce. He merely introduced evidence that the home had cost roughly $5 million to build years earlier. In fact, David concedes that, during the divorce hearing, he "introduced no affirmative evidence as to the property's value." *See* David's May 15, 2024 Opposition Brief at p. 41, n. 6. Given David's failure to introduce any evidence of the home's fair market value, the trial court had only Shery's opinion and her testimony about the two appraisals.

{¶ 30} Although Shery expressed uncertainty about the home's value, she opined that it was worth less than she and David had paid. Her opinion was consistent with her unchallenged testimony about the results of two appraisals, which had assigned a fair market value of $3.8 million and $4.0 million respectively. On the record before us, we see no evidentiary support for the trial court's determination that the fair market value of the marital residence was $5 million at the time of the divorce. The trial court abused its

discretion in assigning that value to the home. Accordingly, Shery's third assignment of error is sustained.

**{¶ 31}** The fourth assignment of error states:

**THE TRIAL COURT ERRED WHEN IT FAILED TO ALLOCATE THE VILLAGES OF WINDING CREEK'S HOMEOWNERS ASSOCIATION'S ACCOUNT RECEIVABLE.**

**{¶ 32}** Shery contends the trial court erred in not fully valuing the Villages of Winding Creek Homeowners Association (VWC), a business that was marital property. In particular, she claims the trial court failed to allocate any value to a particular account receivable. Shery argues that the trial court had notice of the account receivable and its status as marital property. Under these circumstances, she reasons that the trial court was obligated to value and distribute it as part of the marital estate.

**{¶ 33}** We find Shery's argument to be unpersuasive. During the proceedings below, the parties agreed to accept an appraiser's valuation of VWC as the final value. They stipulated that "no further evidence or testimony shall be submitted to the Court on the value of VWC Holdings, LLC." The trial court later adopted the appraiser's valuation. Although Shery now complains that the appraiser's valuation omitted an account receivable, this argument is precluded by her stipulation that the trial court would consider "no further evidence or testimony" beyond the appraiser's opinion. The fourth assignment of error is overruled.

**{¶ 34}** The fifth assignment of error states:

**THE TRIAL COURT ERRED IN VALUING DESIGN HOMES &**

**DEVELOPMENT CO.**

**{¶ 35}** Shery contends the trial court erred in overvaluing Design Homes & Development Company, a marital-property business that the parties started in 1987. Specifically, she claims the trial court erred in not imputing a higher salary to her than she actually received.

**{¶ 36}** The record reflects that Shery received annual compensation of $86,000 as the principal owner and manager of the business, which was in the custom-home-building industry. The company had approximately 20 employees and generated gross income of $16 million to $22 million per year.

**{¶ 37}** Shery's expert, Allan Duvall, valued the business at a little over $5 million. In so doing, he determined that Shery's salary was inappropriately low and imputed a higher one. He examined the salaries earned by top executives at subsidiaries of David's company, Leadwise, Inc. Those subsidiaries had gross incomes roughly in line with Designs Homes' gross income, and the executives at Leadwise's subsidiaries earned an average of roughly $504,000. Duval opined that Shery's salary should be in a similar range, and he assigned her a salary of $460,000. His adoption of that higher figure negatively affected his valuation of Design Homes.

**{¶ 38}** David's expert, Greg Toman, valued Design Homes at $6.7 million. He used the same general methodology as Duvall but declined to adjust Shery's salary. Although Toman believed she was underpaying herself, he opined that she also was overpaying other key employees. As a result, he concluded that the total compensation paid to Design Homes' top employees was appropriate. He saw no need to adjust Shery's salary to

create a more accurate picture of the company's earnings.

{¶ 39} In its written decision, the trial court adopted Toman's valuation of $6.7 million for Design Homes. It found this to be "the more reliable and credible number." The trial court referenced Toman's opinion that Shery may have underpaid herself while significantly overpaying other key employees. The trial court also expressed some concern about whether salaries paid in the custom-homebuilding industry were fairly comparable to the salaries received by key executives of Leadwise's subsidiaries.

{¶ 40} On appeal, Shery acknowledges that abuse-of-discretion review applies to the trial court's adoption of Toman's valuation figure. "An abuse of discretion occurs when the decision demonstrates the trial court's attitude is unreasonable, arbitrary, or unconscionable." *Pollock v. Mullins*, 2024-Ohio-3423, ¶ 20 (2d Dist.). We see no abuse of discretion here. The trial court considered two competing valuation figures and provided a reasonable explanation for choosing Toman's. We see no grounds for reversal. Accordingly, the fifth assignment of error is overruled.

{¶ 41} The sixth assignment of error states:

**THE TRIAL COURT ERRED IN VALUING BRANTWOOD DEVELOPMENT, LLC.**

{¶ 42} Shery challenges the trial court's valuation of Brantwood Development, LLC, another of the parties' marital-property businesses. Brantwood Development's primary asset was a $2.8 million tax-incremental-financing loan to the city of Riverside repayable over 30 years at five-percent annual interest. The loan's purpose was to fund public-infrastructure improvements.

{¶ 43} The parties stipulated that David held a 22.35 percent ownership interest in Brantwood. They disagreed about the value of his interest. Shery's expert, Alan Duvall, valued David's interest in Brantwood Development at $780,000. David's expert, Greg Toman, valued his interest at $472,000. The differing valuations stemmed from a dispute over whether the city's semi-annual payments to Brantwood Development would rise over time if property values increased.

{¶ 44} The trial court found no evidence that the amount of the city's periodic payments to Brantwood Development would rise if property values rose. In its written decision, it adopted David's proposed $472,000 valuation, reasoning:

> The court finds that Mr. Duvall failed to provide any evidence that increases in [tax incremental financing] occur as a result of increases in property values. Furthermore, the court reviewed what it believes to be the contract between the City of Riverside and Brantwood Development, LLC and it was specifically stated that the contract would be repaid at a 5% interest rate. Therefore, the court finds that Mr. Toman's figure is more credible, reliable, and accurate, and as a result, finds that David's 22.35 [percent] interest in Brantwood Development, LLC is $472,000.00.

{¶ 45} On appeal, Shery contends the terms of the agreement between the city and Brantwood Development established that payments to Brantwood would increase if property values increased. She also cites evidence suggesting that Brantwood would fail to recoup its full investment if the city's payments did not increase over time. She reasons too that David received a larger distribution from Brantwood in 2021 than he would have

received if payments from the city did not rise with property-value increases. In response, David asserts that the agreement at issue did not provide for rising payments based on increased property values. With regard to the 2021 distribution, he claims it included cash Brantwood had retained in prior years.

{¶ 46} Upon review, we find dispositive the language of the written agreement between the city of Riverside and Brantwood Development. That agreement, which is part of the record, is titled "BRANTWOOD II SUBDIVISION TAX INCREMENT FINANCING AND INFRASTRUCTURE DEVELOPMENT AGREEMENT." It contemplated the construction of a housing subdivision, including necessary public-infrastructure improvements, on certain real estate. It provided for owners of any portion of the affected property to make semi-annual "service payments" to the Montgomery County Treasurer, in lieu of paying property taxes, for up to 30 years. Under Section 1 of the agreement, these service payments were to be "in the same amount as the real property taxes that would have been charged and payable[.]"

{¶ 47} Section 10 of the agreement governed repayment of the city of Riverside's $2.8 million loan from Brantwood Development. It provided for the city to pay Brantwood Development "an amount not to exceed the total actual amount of funds deposited to [an] Escrow Account by [Brantwood] to construct the Public Infrastructure Improvements plus an amount equal to 5% interest annually on the outstanding balance until such amount has been repaid or the expiration of the TIF exemption and the final collection of Service Payments." The agreement further provided that the city's obligation to repay Brantwood Development "is limited to revenues received by the City from the Services Payments

from the Brantwood TIF." The agreement also outlined how Brantwood was to be repaid. It stated:

> Commencing with the first collection and distribution of Service Payments to the City, the City shall first pay, solely from such Service Payments, any compensation due and owing the Mad River School District, which has not been paid by the Montgomery County Treasurer; second, the City shall pay, solely from such Service Payments, any outstanding amounts owed for the construction of any Public Infrastructure Improvements; *and third, the City shall pay any remaining amounts of such Service Payments to the Owner [i.e., Brantwood Development] until the Owner has been paid a maximum amount equal to the Owner's deposits to the Escrow Account, plus any interest due, as set forth above.* Payments to the Owner pursuant to this Section shall be made twice a year each year not later than 30 days from receipt of each half final settlement of real estate taxes from the County [Treasurer/Auditor].

(Emphasis added.)

{¶ 48} Finally, if the 30-year TIF property-tax exemption expired before Brantwood Development recouped its full loan balance plus interest from service payments, the agreement relieved the city of any obligation on the unpaid balance.

{¶ 49} In essence, the TIF agreement between the city of Riverside and Brantwood Development granted affected property owners a property-tax exemption for up to 30 years. In lieu of taxes, the property owners were to make "service payments" to the

county. Because those service payments were "in the same amount as the real property taxes that would have been charged and payable," the service payments from property owners presumably would rise over time. When service-payment revenue was collected, the agreement provided for the city to distribute it first to the local school district and second to pay any public-infrastructure-improvement debt. After satisfying these obligations, the agreement obligated the city to pay Brantwood Development "any remaining amounts" until Brantwood Development is repaid in full with interest or until the 30-year TIF tax exemption expires.

{¶ 50} Given that revenue generated from the property owners' service payments likely would rise over time, the pool of money available for the city to repay Brantwood Development also likely would increase. As Brantwood Development was entitled to all "remaining amounts" from service-payment revenue, it follows that the city's semi-annual payments to Brantwood Development may increase over time as property values increase. The trial court abused its discretion in finding otherwise and basing its valuation of David's interest in Brantwood Development on a finding that the city's payments to Brantwood Development could not increase over time as property values increase. Shery's sixth assignment of error is sustained.

### III. David's Cross Appeal

{¶ 51} David's first assignment of error on cross appeal states:

**THE TRIAL COURT ERRED WHEN IT FOUND IN ITS DECISION AND DECREE OF DIVORCE THAT LEADWISE, INC.'S VALUE AS OF DECEMBER 31, 2020, WAS $115,700,000.00, AND THAT DAVID**

**OAKES' SHARE OF LEADWISE, INC. AT THAT TIME HAD A VALUE OF $80,180,100.00.**

{¶ 52} David challenges the trial court's valuation of Leadwise. He argues that the trial court erred in its "wholesale adoption" of the value proposed by Allan Duvall, who was Shery's valuation expert. David contends the trial court failed to explain its adoption of Duvall's valuation in sufficient detail for us to determine whether its decision was equitable. He also claims the trial court erred in adopting Duvall's valuation despite stating that it was "not totally satisfied with any of the three expert reports in this matter." Relying on *Miller v. Miller*, 2021-Ohio-4573 (10th Dist.), David asserts that the trial court was obligated to conduct a "block-by-block evaluation of the evidence" rather than conducting a "global" evaluation of which expert's valuation was most credible as a whole. Finally, David contends Duvall's valuation was flawed because it (1) included non-recurring income, (2) assumed that all Leadwise income could be distributed to the company's owners and applied a 10-percent growth rate without accounting for increases in working capital and capital expenditures, (3) failed to apply a discount for various risk factors, (4) assumed a 26 percent tax rate rather than a 39 percent rate, and (5) failed to apply any marketability discount.

{¶ 53} When parties present substantially different valuations of an asset, a trial court is free to believe all, part, or none of any witnesses' testimony. *Landis v. Landis*, 2020-Ohio-6768, ¶ 9 (2d Dist.). "The court, in the end, must make its own determination as to valuation based on the evidence presented." *Id.*, citing *James v. James*, 101 Ohio App.3d 668, 681 (2d Dist. 1995). "A reviewing court must affirm a trial court's

determination if it is supported by competent, credible evidence and is not otherwise an abuse of discretion." *Id.* at ¶ 10. A trial court abuses its discretion when its attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 54} In the present case, the trial court heard valuation testimony from three experts: Alan Duvall, Greg Toman, and Rebekah Smith. Shery's expert, Duvall, and David's expert, Toman, presented competing valuation reports. Duvall valued David's interest in Leadwise at $108,800,000, whereas Toman valued his interest at $27,480,000. For her part, Smith testified as a rebuttal witness for David. After correcting perceived errors in Duvall's valuation, Smith opined that David's interest in Leadwise was $30,686,000.

{¶ 55} The trial court filed its 48-page written decision on September 29, 2023, resolving the valuation dispute and other issues. With regard to David's interest in Leadwise, the trial court recognized that all three experts had "extensive knowledge in the field of valuation." Before addressing differences in the parties' proposed valuations, the trial court noted that it was "not totally satisfied with any of the three experts' reports in this matter." The trial court nevertheless stated that it could not arbitrarily select a figure "between the numbers suggested by the experts." The trial court recognized that it was

permitted to arrive at its own valuation based on the evidence presented. It found itself incapable of doing so, however, reasoning:

> . . . Given the numerous factors that are involved in evaluating the fair market value of a Sub-Chapter S Corporation as complex as Leadwise, Inc., it is obvious to the court that if it changes one factor, the court would be unaware of what significance that would have on other factors that were used in any one of the evaluations. Therefore, in essence, the court must pick one of the evaluations as determined by the three experts. Therefore, the court will review the below significant factors the court considered in ascertaining which of the two reports [was] the most credible, reliable, and accurate.

**{¶ 56}** The trial court found that "[a]lthough Mr. Duvall and Mr. Toman used the same methodology in arriving at their fair market values for Leadwise, Inc., the vast difference in their valuations is a result of five significant differences they used in their application of different factors." The trial court engaged in nearly 10 pages of analysis addressing those factors and other valuation issues. It identified the five key factors as: (1) using Leadwise's financials from 2016 through 2020 (Duvall's approach) or using only 2020 financials (Toman's approach); (2) applying a company-specific risk adjustment of .19 percent (Duvall) or 3.7 percent (Toman); (3) adopting a 26 percent to 29 percent tax rate (Duvall) or a 36 percent tax rate (Toman); (4) assuming 10 percent annual growth for five years with 3 percent growth thereafter (Duvall) or assuming only 3 percent growth going forward (Toman); and (5) including as income a portion of Leadwise's COVID-era

"Paycheck Protection Program" (PPP) funds (Duvall) or excluding PPP funding as non-recurring revenue (Toman).

{¶ 57} On each of the foregoing issues, the trial court found Duvall's approach to be the most credible and reliable. In addition to its analysis of those factors, the trial court cited other evidence supporting Duvall's valuation. It found that David and another key principal of Leadwise together earned between $8 million and $12 million annually in salary and distributions. The trial court reasoned:

. . . It seems to stretch the limits of credibility to suggest that a Subchapter S Corporation that would generate anywhere near this annual income for just two of its principal owners would have a fair market value of $39,660,000.00. This does not take into account that Leadwise, Inc. has built substantial owner equity over the history of its existence at the same time as paying out substantial sums to its principal owners. Furthermore, as noted by Mr. Duvall, Leadwise, Inc., for most of its history, has been able to purchase equipment, with financing, etc., all being done internally, and the company has virtually no need to go outside to financial institutions to finance their projects. When all of these factors are looked at together, the court finds that the fair market value as determined by Mr. Duvall is the more reliable and accurate number.

Additionally, the court finds that plaintiff's Exh. 150 was a valuable piece of evidence. Exhibit 150 was an internal projection of David's income assuming that he continued to reduce his ownership interest in Leadwise,

Inc. Leadwise, Inc.'s internal projections indicated that as of 2023, David's share of the net income from Leadwise, Inc. would be $12,542.40 [sic]. Therefore, the entire net income of Leadwise, Inc. projected for 2023 would be $19,841,000.00. It seems to stretch the bounds of credibility to suggest that a company that would generate almost $40,000,000.00 in net income in 2 years would have a fair market value of approximately $39,660,000.00.

{¶ 58} Although the trial court adopted much of Duvall's valuation, it explicitly disagreed with him on two issues. Unlike Duvall, the trial court declined to assign any value to David's "founder's option," which entitled him to repurchase all outstanding Leadwise shares. The trial court also rejected Duvall's calculation of David's ownership interest in the company. The trial court adopted Toman's conclusion that David owned 69.3 percent of Leadwise. As a result of these two adjustments, the trial court rejected Duvall's opinion that David's ownership interest in the company was worth $108,800,000. By declining to assign any value to the founder's option, adopting Toman's finding that David owned 69.3 percent of the company, and otherwise adopting Duvall's findings, the trial court valued David's interest in Leadwise at $80,180,100.

{¶ 59} Upon review, we reject David's argument that the trial court erred in its "wholesale adoption" of Duvall's opinion. Duvall valued David's interest in the company at over $108 million. The trial court valued that interest at just over $80 million, which is far from a complete adoption of Duvall's position. The trial court engaged in a detailed discussion of the competing expert opinions. It also identified key issues on which the experts disagreed, and it found Duvall's analysis of those to be the most credible and

reliable.

**{¶ 60}** Although David complains that the trial court failed to explain why it found Duvall's valuation to be the most accurate, the trial court's written decision and the experts' testimony as a whole are sufficiently clear. With regard to reviewing Leadwise's financials, Duvall believed looking at records from 2016 through 2020 provided a more accurate perspective than relying on 2020 financials alone. The trial court agreed. With regard to the company-specific risk adjustment, the trial court simply was persuaded that Duvall's .19 percent adjustment was more accurate than Toman's 3.7 percent adjustment. With regard to the proper tax rate, the trial court largely relied on Duvall's application of current tax rates rather than Toman's use of a projected future tax rate. As for the company's growth rate, the trial court adopted Duvall's 10 percent rate for five years followed by a three percent rate thereafter. The trial court found this growth rate more accurate than Toman's projected straight three percent rate. Given the length of time it took to litigate the case, the trial court noted that even Duvall's 10 percent projected growth rate for 2021 proved to be too conservative, as Leadwise actually grew by nearly 30 percent that year. Finally, the trial court agreed with Duvall's argument that including some PPP revenue in Leadwise's gross revenue was appropriate, because it compensated the company for COVID-related losses and failing to do so would artificially undervalue the company. On each of the foregoing issues, the question is whether the trial court abused its discretion in reaching its conclusion. Having reviewed the trial court's decision and the extensive testimony presented by Duvall, Toman, and Smith, we believe the record is sufficient to enable us to perform appellate review.

{¶ 61} As noted above, David also contends the trial court erred in adopting Duvall's valuation despite stating that it was "not totally satisfied with any of the three expert reports in this matter." David cites the Tenth District's opinion in *Miller*, 2021-Ohio-4573, for the proposition that the trial court was not permitted to choose the least flawed expert opinion and to adopt it wholesale. In *Miller*, a divorce case, the parties presented widely-divergent expert opinions about the value of the husband's optometry practice. Despite finding both parties' valuations "flawed in certain respects," the trial court in *Miller* adopted the wife's expert's valuation without any revisions. The Tenth District found an abuse of discretion by the trial court, reasoning:

> . . . Simply noting that the expert's analysis was "flawed" (albeit less flawed than the competing expert's) did not excuse the trial court, in our view, from the need then to evaluate whether those unspecified flaws counseled reexamination or revision of any of the expert's bottom line numbers.
>
> . . .
>
> . . . Again, we do not know what aspects of [wife's expert's] analysis the trial court found to be flawed. But a trial court practice designed to adopt without modification and as an all or nothing proposition the results of a concededly flawed expert analysis simply because countervailing analysis was more flawed seems to us—as applied in this particular context involving the testimony we have referenced—an abuse of discretion as unreasonable and arbitrary.

*Id.* at ¶ 14, 16.

**{¶ 62}** Relying on *Miller*, David asserts that the trial court should have conducted a "block-by-block evaluation of the evidence" rather than engaging in a "global" evaluation of which expert's valuation to adopt. *Id.* at ¶ 12. He contends its failure to do so constituted an abuse of discretion.

**{¶ 63}** Upon review, we find David's argument to be unpersuasive. Unlike *Miller* the trial court did not wholly adopt the value proposed by Duvall or Toman. Most notably, it explicitly rejected Duvall's assignment of a $22 million value to David's founder's option. Contrary to Duvall's opinion, the trial court gave no value to the option. Additionally, Duvall opined that David owned 75 percent of Leadwise, whereas the trial court determined that David owned 69.3 percent, which was consistent with Toman's analysis. These adjustments by the trial court presumably addressed some of its dissatisfaction with Duvall's valuation.

**{¶ 64}** Although the trial court may have been "not totally satisfied" with any of the expert valuations for additional reasons, it correctly noted that it could not arbitrarily choose a valuation somewhere in the middle. "While the trial court is not bound to use one valuation method over another, it is nonetheless restricted to the valuations in evidence." *Berger v. Berger*, 2015-Ohio-5519, ¶ 21 (11th Dist.); *see also McCoy v. McCoy*, 91 Ohio App.3d 570, 578 (8th Dist. 1993) ("[I]f the trial court summarily arrives at a valuation of an asset or property, even though between the two extremes of the opposing parties' witnesses, without a proper evidential predicate, such would be error."). Without an evidentiary predicate, "[a] trial court cannot devise its own value that falls between the parties' respective expert's testimony." *Berger* at ¶ 21. "Although a trial court

is free to choose between the values presented by the parties according to the weight of the evidence, it is not free to deviate from the evidence before it. *Id.*

{¶ 65} Here the trial court acknowledged its discretion to arrive at its own valuation based on the evidence. It declined to do so, however, finding itself unqualified independently to analyze "the numerous factors that are involved in evaluating the fair market value of a Sub-Chapter S Corporation as complex as Leadwise, Inc." Therefore, as a practical matter, the trial court felt constrained to "pick one of the evaluations as determined by the three experts."

{¶ 66} Having reviewed volumes of testimony and boxes of exhibits addressing the value of Leadwise, we are sympathetic to the trial court's concerns. David's own rebuttal expert, Rebekah Smith, illustrated the dilemma. She acknowledged that changing one valuation factor very well may "impact the amount of another change." In other words, Smith recognized that the valuation factors and adjustments to them were interdependent. At one point, Smith explained: "Valuation isn't, isn't done in a vacuum, you can't just change one single number and have a yes or no." She added: "It is complex, so, I can't sometimes just isolate [one] particular element, ok." Smith's testimony supported the trial court's reasonable concern "that if it changes one factor, the court would be unaware of what significance that would have on other factors that were used in any one of the evaluations."

{¶ 67} In short, the parties based their competing valuations on the opinions of seasoned experts who the trial court found had "extensive knowledge in the field of valuation." The trial court understandably lacked this extensive experience and

knowledge, which, of course, was why expert opinions were needed. Even Smith acknowledged on cross-examination that business-valuation issues, including calculating a company-specific risk factor, require "professional judgment" in assessing and weighing interrelated considerations. It follows that making such determinations is within the realm of financial experts.

{¶ 68} We do not suggest that courts have no obligation to attempt to resolve difficult valuation questions. Here, however, the trial court did the best it could and found itself unable to conduct its own valuation analysis based on the evidentiary record before it. The trial court may have possessed a general sense that one expert's figure was too high while the other expert's was too low. Lacking the expertise of a certified public accountant or other financial professional, however, the trial court was unable to render its own valuation opinion. Given that it also could not arbitrarily pick a mid-range valuation without an evidentiary predicate, one remaining option was to adopt, albeit with modifications that it was comfortable making, the expert opinion that it found most credible and reliable.[1] On the record before us, we see no abuse of discretion in the trial court's adoption of this general approach.

{¶ 69} The remainder of David's assignment of error addresses the following factors that led to the experts' divergent valuations.

### A. Consideration of non-recurring revenue

{¶ 70} David first challenges the trial courts' inclusion of some COVID-relief PPP funding and a COVID-related payment from the Bureau of Workers' Compensation

---

[1] The trial court conceivably could have appointed a special master to assist it. But neither party appears to have raised that issue in the trial court, and it is not an issue on appeal.

(BWC) in Leadwise's income. David asserts that the trial court erred in adopting Duvall's valuation insofar as it included this non-recurring revenue. He reasons that treating one-time income as on-going revenue erroneously skewed Duvall's growth projections for Leadwise. David criticizes the trial court for adopting Duvall's position on the foregoing issue without explaining why.

{¶ 71} Upon review, we see no abuse of discretion in the trial court's adoption of Duvall's inclusion of some non-recurring COVID-related revenue and a BWC payment in Leadwise's income. Duvall explained why he believed it was proper to include in the company's income a special BWC dividend and a portion of $5.5 million in PPP funding from the federal government. At several points, he opined that some of Leadwise's construction-related segments were hurt financially by COVID. For example, a subsidiary known as Threecore increased sales from 2019 to 2020 but swung from a $2.9 million profit in 2019 to a $600,000 loss in 2020. Duvall recalled that another Leadwise subsidiary known as Matrix also had "some issues." After analyzing the situation, he attributed the losses to project delays and increased expenses caused by COVID. In his expert opinion, there was "zero question" that Leadwise had been harmed financially by COVID. We note that David's rebuttal expert, Rebekah Smith, also testified that she "understood [it] to be true" that Leadwise as a whole had sustained COVID-related losses. In light of that fact, Duvall included in one year of Leadwise's income just $1.8 million of $5.5 million in PPP funding as well as a BWC payment to the company.

{¶ 72} Duvall reasoned that it was appropriate to offset non-recurring losses attributable to COVID with a portion of the non-recurring COVID-related funding. In his

opinion, failing to do so would have painted a distorted financial picture and would have resulted in the effect of non-recurring losses and expenses being projected into the future. By offsetting the non-recurring losses with non-recurring income, Duvall brought "everything back to even" and negated the one-time impact of COVID on Leadwise's future performance. Although David disagrees with Duvall's treatment of the issue, we cannot say the trial court acted unreasonably in accepting Duvall's analysis.

### B. Projected growth rate, working capital, and capital expenditures

{¶ 73} David next contends the trial court erred in applying a 10 percent growth rate for five years and in assuming that all Leadwise income could be distributed to the company's owners without accounting for increases in working capital needed to cover rising capital expenditures.

{¶ 74} Upon review, we see no abuse of discretion in the trial court's adoption of a projected10 percent growth rate for five years with three percent growth thereafter. These figures were based on Duvall's projections. Given the length of time it took to resolve the case, even a 10 percent projected growth rate for 2021 proved to be too low. Leadwise actually grew by nearly 30 percent that year, which was the first year of Duvall's projections. That being so, we certainly cannot say the trial court erred in rejecting Toman's analysis, which projected mere three percent growth every year.

{¶ 75} With regard to a need for increased working capital to cover rising capital expenditures, David relied largely on testimony from rebuttal expert Rebekah Smith. She stated that Duvall's growth projections and corresponding net-income projections failed to take into account that rapid growth comes at a cost. According to Smith, Leadwise

would need to retain more of its earnings to cover additional capital expenditures necessary to create the growth. Smith testified that Duvall did not make any adjustments to working capital to account for increased capital expenses.

{¶ 76} While reviewing Duvall's valuation report, she testified as follows:

. . . [Y]ou can see then in the next box is that there is no adjustment for working capital when Mr. Duvall does his analysis. Because he doesn't set aside any of that net income as money that the Company needs to sort of hold back. And what you see, is that as a percentage of revenues as he grows the Company from being 135 million dollar Company up to and almost 200 million dollar Company, the percentage of working capital keeps falling, and falling, and falling, until eventually, he's sort of at the end of his projection period, it's only 8 and a half percent which is way below what Compan[ies] in this industry operate with at 15 percent.

December 9, 2022 Transcript Vol. 7 at p. 1159.

{¶ 77} Later in her testimony, Smith noted that Duvall's "working capital number doesn't move in the same way that it historically has moved when there was growth." She opined that Duvall's "working capital just stays flat, so, as the Company is growing, he is basically distributing every dollar and not keeping any in the Company." *Id.* at 1161. Smith stated that "[t]he Company is not going to be able to grow at 10 percent if you don't leave any money behind." *Id.* Smith made adjustments that she deemed necessary and opined that they reduced Duvall's valuation of Leadwise as a whole by $10.3 million.

{¶ 78} In its written decision, the trial court did not address the foregoing issue. It

merely recognized that "for most of its history, [Leadwise] has been able to purchase equipment, with financing, etc., all being done internally, and the company has virtually no need to go outside to financial institutions to finance their projects." While this may be true, it does not address Smith's point that rapid growth, if funded internally, requires increased capital expenditures that in turn require increased working capital. According to Smith, this means that more of the company's earnings must be retained to pay for the grown, which negatively impact's the company's value.

{¶ 79} On appeal, Shery too points out that Leadwise historically "has grown exponentially without resorting to any outside funding or borrowing." She also notes that working capital traditionally has increased with the company's growth. But these observations seemingly support Smith's point. Leadwise indeed can fund its own growth if it increases retained earnings and working capital to account for necessary capital expenditures accompanying the growth. According to Smith, the problem is that in her opinion Duvall's valuation, which the trial court largely adopted, failed to take into account the need for increased working capital to cover increased capital expenses.

{¶ 80} Given that the trial court did not address the foregoing issue, which also does not appear to have been specifically addressed in Duvall's valuation report, we express no opinion as to the correctness of Smith's proposed $10.3 million reduction in Leadwise's value. We will remand the case for the trial court to make a finding as to whether Duvall's growth and net-income projections erroneously failed to take into consideration the cost of that growth.

### C. Company-specific risk factors and lack-of-marketability discount

{¶ 81} David next challenges the trial court's adoption of Duvall's analysis of certain company-specific risk factors as well as Duvall's failure to apply a marketability discount when valuing Leadwise.

{¶ 82} With regard to Duvall's risk-factor analysis, which the trial court adopted, David contends it did not adequately account for factors such as the company's service concentration, lack of customer diversity, dependence on David as the majority owner, competitive risk, and interest-rate risk. Although Duvall applied a .19 percent risk-factor adjustment, David's expert, Toman, found a 3.7 percent discount to be appropriate. For her part, Smith believed a four percent discount was the most accurate.

{¶ 83} In its written decision, the trial court summarized the competing expert testimony regarding the appropriate company-specific risk adjustment. *See* September 29, 2023 Decision at p. 9-11. In so doing, it specifically addressed most of the risk factors cited by David on appeal. After noting Duvall's and Toman's agreement that this aspect of valuation was "the most subjective," the trial court found Duvall's .19 percent adjustment to be "the more credible and accurate number." In adopting Duvall's analysis, the trial court stated:

Mr. Duvall disputes that Leadwise, Inc. has a lack of diversity. Although Leadwise, Inc. does not provide multiple product lines and services, the companies under Leadwise, Inc.'s umbrella provides [sic] every service that is needed in a construction related type job. Therefore, Mr. Duvall stated that Leadwise, Inc. was unique in this instance, and that when it would contract to do a construction job, it did not have to outsource

any of these services. As a result, they were able to provide every client with every service that was needed to accomplish the project. Furthermore, Mr. Duvall indicated that Leadwise, Inc. is diverse in the sense that it is a national corporation that provides work throughout the United States, and in fact, has offices and has conducted work in numerous states.

Even though David is the majority owner of Leadwise, Inc., he has been reducing his ownership role over the last several years and there seems to have been no adverse impact on the company's revenue and growth as a result of the same. Furthermore, David has indicated he believes that he has a very capable management team in place that is able to maintain customer relationships and continue to do the work needed to build the company.

Mr. Duvall acknowledges that Leadwise, Inc. does a significant amount of work for a couple of customers, those being primarily Amazon and Walmart. However, Mr. Duvall testified that in recent time, the percentage of work provided by large customers to Leadwise, Inc. has decreased from approximately 50% to 37%. Furthermore, these customers have been long term customers for Leadwise, Inc. and there is no indication that they are unhappy with Leadwise, Inc. services or have any intention of taking their business elsewhere. Additionally, both Mr. Toman and Ms. Smith seem not to take into account at all the unique nature of Leadwise, Inc. Not only is Leadwise, Inc. a significantly large player in the construction

industry, and provides virtually all of the construction services needed for a customer under one umbrella, Leadwise, Inc. has significantly outperformed the industry year after year after year. Therefore, it would suggest to this court that a lower specific company cap risk is appropriate, and as a result, [the court] find[s] that Mr. Duvall's determination as to the company specific risk factor is the more credible and accurate number.

*Id.* at p. 10-11.

{¶ 84} In short, the parties' experts agreed that an adjustment to Leadwise's valuation was necessary to account for company-specific risk factors. The trial court weighed the competing evidence as to the proper discount and, based on the reasoning quoted above, credited Duvall's testimony on the issue. We cannot say the trial court acted unreasonably in doing so.

{¶ 85} Finally, with regard to a marketability discount, Toman and Smith testified that Leadwise's value needed to be discounted due to a relative lack of liquidity. In her expert report, Smith explained that "[a]ll else being equal, an investment in which the owner is able to achieve liquidity quickly is worth more than an investment in which the owner is not able to liquidate the investment quickly." According to Smith, "[t]his lack of marketability forces an investor to seek a price concession to compensate for being locked into an illiquid and long-term investment." Because Leadwise was not a publicly-traded company and because there were restrictions on shareholders selling or transferring shares, Smith and Toman agreed that a 10 percent discount should be applied. Smith testified that Duvall's valuation report lacked any marketability discount.

{¶ 86} For his part, Duvall agreed that a marketability discount was necessary. He

explained that "because [Leadwise] is a private company . . . the ability to convert stock into cash is hindered and[,] therefore, deserves a discount." Contrary to David's argument on appeal and Smith's testimony below, Duvall insisted that he effectively had applied such a discount when determining the company's capitalization rate or "cap rate," which was a key component of the valuation analysis. He stated that Leadwise's cap rate was "built up" by making adjustments for projected growth and various risk factors. According to Duvall, one risk factor he considered was the relatively small size of Leadwise. He opined that a marketability discount was included in the small-company discount he applied when determining the company's cap rate. Therefore, Duvall saw no need for a redundant "second level of discounting" for lack of marketability.

{¶ 87} In her rebuttal testimony, Smith denied that any component of Duvall's cap-rate "build up" accounted for a lack of marketability. After noting that Leadwise was a private company with restrictions on selling shares, Smith explained that cap rates are constructed using "public company data." She asserted that Duvall's small-company discount was predicated on data from small publicly-traded companies with "liquidity options" that Leadwise lacked. Smith opined that Duvall's small-company discount was not in any sense a "marketability discount" because there was no marketability component to it.

{¶ 88} In its written decision, the trial court adopted Duvall's .19 percent company-specific risk discount without specifically addressing the marketability issue. The trial court did not determine whether Duvall had neglected to adjust Leadwise's cap rate to account for a lack of marketability, as Smith claimed, or whether a marketability discount was

embedded in the small-company discount Duvall used when computing the company's cap rate.

**{¶ 89}** Based on our review of the record, we find Duvall's own testimony on the issue to be unclear. He explained that developing a company's cap rate required assigning risk to various factors. One factor involved company size with "the smaller the company, the higher the risk." On direct examination, Duvall cited data examining risk premiums for small public companies in Leadwise's "size range." Later on direct examination, Duvall was questioned about his application of a marketability discount. He responded:

> I applied it through the cap rate. I mean, the cap rate builds up the risks on an incremental basis you know, so, now, by the time you get through the cap rate, you've got the value of the company, you know, of this size. It's already in the size premium. I don't see any need to do another, two answers, number one, I don't see a need to do a second level of discounting, as you used the term double dipping.
>
> The second is, basically, Mr. Oakes has a control over one hundred percent of the company. You could easily argue that he's—the control premium could be applied[.]"

June 7, 2022 Transcript Vol. II at p. 303-304.

**{¶ 90}** On cross-examination, Duvall addressed the subject again. When asked whether his cap-rate calculations had treated Leadwise as a small publicly-traded company, he responded:

Well, the cap rate starts a build-up [w]ith a small—um—based on large public companies. But then it has metrics in it like a size premium that brings the cap rate down to the size that Leadwise is. So, the rate is geared to be, to apply to the size of company Leadwise actually is.

December 5, 2022 Transcript Vol. III at p. 395.

{¶ 91} Duvall then engaged in the following exchange with David's counsel:

Q. And you claim that you accounted when you testified before that you accounted for a discount for the lack of marketability—um—by the percentage that you used for the size premium when you were building up your cap rate, right?

A. That's the risk factor, yes.

Q. And then that size premium percentage you used when you were building up your cap rate that was based on publicly-traded companies, right?

A. We've been through that. No, the cap rate is based on a company that's Leadwise's size. It starts with public but it ends up with a company of Leadwise's size.

*Id.* at p. 405.

{¶ 92} Finally, on redirect examination, Duvall elaborated on the concept of a "control premium" in the context of a marketability discount. He stated:

Well, first you have to understand how the discount from marketability typically is generated. It's generated from statistics relating to control premiums. You know, how much people pay to get control. Then

you take the inverse and that's your lack of marketability. Well, you know, in this case, you know, [David] directly owns, you know, because they're invested what I'm saying 73 and a half to 75 percent of the stock, but through the [Founder's] option, he basically, owns over 100. I mean, he owns 100. He's got a super control. So you could argue that there should be a control premium not a [marketability] discount.

*Id.* at 424.

**{¶ 93}** Although not entirely clear, Duvall's testimony suggests to us that he may have conflated the concepts of company size and marketability. A company may be relatively large or small. As Duvall noted, a smaller company receives a valuation discount in recognition of its higher investment risk. Whether large or small, a company also may be private or public. As both parties' experts recognized, a privately-held company receives a marketability discount due to the comparative difficulty in converting its stock to cash. In his testimony, however, Duvall repeatedly seemed to say that no discount was needed to account for Leadwise's lack of marketability because he already had made a cap-rate adjustment to account for investment risk associated with the company's small size. It appears to us, however, that this reasoning involves a non sequitur. We fail to see how a discount recognizing the risk of investing in a small company, whether public or private, necessarily addresses the separate concern an investor might have about the lack of marketability inherent in a private company.

**{¶ 94}** A small-company discount and a marketability discount appear to address different issues. This view is consistent with the trial court's decision in *Bohme v. Bohme*, 2015-Ohio-339 (2d Dist.), a case cited by David on appeal. One issue in *Bohme* involved

valuing the husband's dental practice. The trial court heard valuation testimony from competing experts. One of those experts was Duvall, who opined that no marketability discount was necessary for two reasons. First, the dental practice was fully marketable because the husband was the sole owner. Second, "Duvall indicated that the lack of marketability [was] built into the capitalization rate, and as a result, he did not feel applying a marketability discount was appropriate[.]" *Id.* at ¶ 5. Without elaboration, the trial court rejected Duvall's position, found a marketability discount necessary, and valued the dental practice significantly lower than Duvall had proposed. *Id.* On appeal, we affirmed in part and reversed in part. *Id.* at ¶ 64. We did so without addressing the applicability of a marketability discount, as that issue had not been raised on appeal. *Bohme* consequently holds less precedential value in the present case than it otherwise might. The trial court's decision in *Bohme* nevertheless does support David's position about the discount for a lack of marketability.

{¶ 95} As for Duvall's additional testimony suggesting that a marketability discount may be unwarranted given David's total control over Leadwise, we disagree. In light of the founder's option, Shery stresses that David has the power to acquire 100 percent of Leadwise's shares and to dispose of them at will. Therefore, she reasons that no discount for lack of marketability was warranted.

{¶ 96} Upon review, we find Shery's argument to be unpersuasive. In our analysis of her appeal above, we upheld the trial court's refusal to assign any value to the founder's option because David was "highly unlikely" ever to exercise the option. It would be incongruous to assign no value to the founder's option yet to rely on David's ability to

exercise the option to circumvent a marketability discount. We note too that unlike someone who owns shares in a public company, David cannot sell his shares on the open market and wait a few days for the transaction to settle. As noted above, David's own expert, Rebekah Smith, acknowledged that an owner of a private company cannot "achieve liquidity quickly" and that this "lack of marketability forces an investor to seek a price concession to compensate for being locked into an illiquid and long-term investment." For the foregoing reasons, we conclude that the existence of the founder's option did not obviate the need for some marketability discount.

{¶ 97} As noted above, the trial court did not address whether Duvall had failed to discount Leadwise's cap rate to account for a lack of marketability or whether a marketability discount had been embeded in Duvall's small-company discount. The parties' experts appeared to agree that some marketability discount was necessary, and we reach the same conclusion. We will leave it to the trial court, as the trier of fact, to determine in the first instance on remand whether Duvall's analysis in fact contained an adjustment to account for Leadwise's relative lack of marketability.

## D. Tax rate

{¶ 98} Finally, David claims the trial court erred in applying a 26 percent tax rate when calculating Leadwise's after-tax earnings. This rate was consistent with Duvall's valuation analysis. David asserts that the trial court should have adopted a 36.1 percent rate used by Toman.

{¶ 99} The main difference in the two tax rates was that Duvall applied current tax rates and took into consideration a qualified-business-income deduction (QBID).

Conversely, Toman examined corporate tax rates dating back to the 1920s. He found that current rates were historically low. He also noted that the rate Duvall used and the QBID deduction itself were set to expire at the end of 2025. Therefore, Toman applied "an average rate over a great number of years" and did not apply the QBID deduction. After noting differences in the two experts' approaches, the trial court simply found Duvall's tax rate "more credible and reliable."

{¶ 100} When adjusting Leadwise's cap rate to account for the impact of taxes, the parties' experts recognized that the company was an S-corporation and, therefore, that it did not pay income tax directly. Instead, its shareholders paid taxes on distributions from the company. That being so, Shery's counsel cross-examined Toman about whether taxes should be considered at all when valuing the earnings of an S-corporation. Toman acknowledged literature stating that a zero-percent tax rate should be applied. He maintained that such a rule only applied in gift-tax cases. Without elaboration, he opined that the zero-tax-rate approach did not apply to general business valuations.

{¶ 101} Ultimately, Duvall and Toman both found it appropriate to take taxes into consideration when valuing Leadwise despite its status as an S-corporation. As noted above, both experts also considered corporate tax rates when doing so. Duvall focused on current rates, and Toman used a blended average of historical rates. Duvall also considered the impact of the QBID deduction on distributions from Leadwise to David.

{¶ 102} On appeal, David cites Toman's testimony that since 1926 corporate tax rates historically have been over 30 percent. He also cites Smith's testimony that corporate tax rates have averaged 37 percent over the last 47 years. Smith explained

that valuing a business involves projecting income, the effect of taxes, and other factors into the future. As a result, she opined that the tax rate at a particular moment in time, while informative, should not be controlling. Like Toman, she found it more appropriate to apply historical averages when valuing Leadwise.

{¶ 103} Although the approach employed by Toman and Smith makes sense, we cannot say the trial court abused its discretion in adopting Duvall's reasonable alternative analysis. David contends the tax rates and QBID deduction on which Duvall relied will sunset at the end of 2025 and may not be renewed. According to Toman, higher rates will take effect if new legislation is not enacted. But none of the experts could say with any certainty what will happen in 2026. Their valuations for Leadwise began with the year 2020—six years before any potential tax-law changes. In essence, Toman and Smith discounted six years of existing tax law to account for what might happen in the future and what had happened in the past. On the other hand, Duvall discounted potential tax-law changes and focused on six years of existing law. Choosing between these alternatives was within the trial court's discretion.

{¶ 104} Based on the reasoning set forth above, we sustain David's first assignment of error in part and overrule it in part. The assignment of error is sustained insofar as the trial court erred in ordering him to pay Shery nearly $29 million without making a finding as to whether Duvall's growth and net-income projections for Leadwise erroneously had failed to consider the cost of growth and the company's relative lack of

marketability. The case will be remanded for the trial court to address those issues.[2] In all other respects, David's first assignment of error is overruled.

{¶ 105} David's second assignment of error states:

**THE TRIAL COURT ERRED WHEN IT FOUND IN ITS DECISION AND DECREE OF DIVORCE THAT THE SOCIAL ROW RESIDENCE PREVIOUSLY GIFTED TO THE OAKES RESIDENCE TRUST IS MARITAL PROPERTY.**

{¶ 106} David challenges the trial court's determination that the parties' residence and a separate lot constituted marital property. He contends the trial court lacked jurisdiction to make any disposition regarding the residence or the lot because they were held in an irrevocable trust that was not a party to the divorce case. Even if the trial court possessed jurisdiction, he claims the home and the lot were not marital property subject to division.

{¶ 107} The parties built the home in 2007 and placed it in Shery's name. In 2009, they created an irrevocable trust known as "The Oakes Residence Trust." The trust identified Shery as the grantor and David as the executor. Under the heading "Intent of

---

[2] In remanding the case, we remain cognizant of the trial court's reluctance to change any one valuation factor based on the effect the change might have on other factors. With regard to Duvall's alleged failure to consider the cost of growth and Leadwise's relative lack of marketability, however, Rebekah Smith quantified the effect of those alleged omissions. According to Smith, Duvall's alleged failure to consider the cost of Leadwise's projected growth overvalued the company as a whole by $10.3 million. She also opined that Duvall's alleged failure to apply a marketability discount overvalued the company by 10 percent. If the trial court concludes on remand that Duvall failed to account for the cost of growth and Leadwise's relative lack of marketability, it remains free to give Smith's testimony whatever weight it deems appropriate.

Trust," the document provided: "It is the Grantor's intent to make a completed gift of the Trust Estate to the Beneficiaries under the terms set forth in this Trust." Acting as grantor, Shery conveyed the marital residence to the trust in 2009. At some point, a parcel of land known as the Greenbriar lot was conveyed to the trust as well.

**{¶ 108}** In the proceedings below, Shery argued that the marital residence and the Greenbriar lot were marital property subject to equitable division because they had been purchased during the marriage with marital funds. Although the home and the lot had been conveyed to an irrevocable trust, Shery testified that the intent of those conveyances was to shelter the assets "from outside invaders" who might sue her or David. Shery denied having any intent to "gift" the home to David. For his part, David agreed that the conveyances had been made "for asset protection." Regardless of the purpose, he nevertheless asserted that the home and the lot in fact had been gifted to the irrevocable trust, an independent third-party entity, meaning that they could not be marital property. David also maintained that the trial court lacked jurisdiction over the trust's assets because the trust had not been made a party to the divorce proceeding.

**{¶ 109}** In its written decision, the trial court noted that no gift tax had been filed in conjunction with the transfer of the residence or lot into the trust. The trial court also found that the parties continued to treat the residence as their own property and to pay all expenses with marital funds. Finally, the trial court noted that the parties once had used the residence as collateral. The trial court then determined that "the Residence Trust is marital in nature and will be divided as such." In support of this determination, the trial court reasoned:

The court finds that Shery did not make an inter vivos gift to David. It was never Shery's intention to convey her ownership interest away in the marital estate, and furthermore, neither of the parties ever executed any of the terms of the trust, which would indicate there was an intent to transfer Shery's marital interest. Ohio case law has demonstrated that determining the nature of a trust is done on a case by case approach based upon the intent and conduct of the relevant parties. In this instance, at no time did either party treat the trust as if it were separate or non-marital property.

David alleges that the real estate residence trust is not properly before the court. David contends that it should have been ordered to be a third party defendant in order for it to be properly before the court. However, the court finds that David had at least constructive notice that the issue of whether the real estate residence trust constituted marital or separate property [sic], and David is the trustee of said trust and could of at any time interpled the real estate trust in as a third party. Additionally, the trust could have requested to have been added as [a] third party defendant at any time and chose not to do so.

{¶ 110} The trial court's divorce decree directly awarded Shery the marital home and the Greenbriar lot while ordering David to "take all necessary steps" to facilitate these transfers to her.

{¶ 111} Upon review, we find it unclear whether the trial court believed that Shery's conveyances of the residence and lot into the trust were invalid and void or whether it

simply treated the trust assets as marital property despite the fact that they were held in a valid irrevocable trust. After carefully reviewing the trial court's written decision, we believe it adopted the latter approach. The trial court characterized the trust as being "marital in nature" based on how the parties had treated the real estate it held. The trial court does not appear to have found Shery's conveyances into the trust invalid, and we see no basis for such a conclusion.

{¶ 112} Nothing in the record suggests that Shery lacked the capacity to place the marital residence and the lot into an irrevocable trust, and we see nothing fraudulent about the conveyance. The transfer was not done without Sherry's knowledge. Indeed, she was the grantor. After consulting a trust attorney, the parties mutually decided to convey the residence and the lot to an irrevocable trust as a means of asset protection. Even if the parties acted casually regarding the trust and treated the residence as their own marital property, the fact remains that Shery purposefully did convey it to an irrevocable trust.

{¶ 113} "An irrevocable trust is an independent third-party entity, and, generally, neither the trust nor the assets held by such a trust are subject to equitable division in a divorce." *Kim v. Kim*, 2020-Ohio-22, ¶ 11 (9th Dist.). Under some circumstances, however, "[p]roperty paid for with marital funds, but . . . held by a third party, including a trust, may be treated as marital property[.]" *Id.* This is consistent with R.C. 3105.171(A)(3), which defines "martial property" to include not just property owned by a spouse but also "[a]ll interest that either or both of the spouses currently has in any real or personal property . . . that was acquired by either or both of the spouses during the marriage." Thus, under appropriate circumstances, if a spouse maintains an interest in real or

personal property held by an irrevocable trust, a trial court may treat that interest as marital property. *See, e.g., Guagenti v. Guagenti*, 2017-Ohio-2706, ¶ 71 (3d Dist.) ("However, to be clear, in this instance Mark does have certain property interests flowing from the 2007 SJG Trust which are subject to R.C. 3105.171(A)(3). While the 2007 SJG Trust itself may not be subject to division, the distributed income received by Mark from the SJG 2007 Trust is a property interest held by Mark.").

{¶ 114} "[W]hen reviewing a trial court's determination regarding the nature of an irrevocable trust in the context of a divorce proceeding, a 'case-by-case approach based upon the intent and conduct of the relevant parties with regard to the formation and the operation of the trust' [is the] most appropriate approach and consistent with the manifest weight standard of appellate review." *Kim* at ¶ 11, quoting *Guagenti* at ¶ 69.

{¶ 115} In *Kim*, a case cited by Shery on appeal, the husband created an irrevocable trust without his wife's knowledge. Under the trust's terms, the husband was the grantor and his brother was the trustee. The husband purchased life-insurance policies with marital funds and placed the policies in the trust. When the parties divorced, the trial court declared the cash value of the policies to be marital property subject to division. The Ninth District affirmed, noting that if it "were to hold otherwise, it would allow a spouse to unilaterally, and without the consent or knowledge of the other spouse, move marital money out of the reach of the other spouse by merely placing it in an irrevocable trust." *Id.* at ¶ 69. The Ninth District rejected the husband's argument that the trial court could not direct the trustee to take any action because neither the trustee nor the trust had been made a party to the divorce case. The appellate court observed that the trial

court had not ordered the trustee or the trust to do anything. "Rather, the trial court credited the cash value of all the life insurance policies within the trust to Husband when the court sought to equalize the distribution of marital property." *Id.* at ¶ 16. The Ninth District found no error because this action was within the trial court's equitable power and because the trial court did not direct the non-party trust or trustee "to take any action in this case." *Id.*

{¶ 116} We see little similarity between *Kim* and the present case. Unlike in *Kim*, Shery and David mutually agreed to convey the marital residence and the lot to an irrevocable trust. Although Shery insisted that she did not intend to "gift" those properties to David, she undeniably did intend to gift them to a third-party irrevocable trust and to have David serve as the trustee. The evidence for this conclusion is found in the language of the trust agreement. Shery's asset-protection rationale did not negate her donative intent. Rather, it explained why she had donative intent and purposefully gifted the marital residence and the lot to the trust. Indeed, the parties' desired asset protection "from outside invaders" existed precisely because Shery deliberately had divested herself of the marital residence and the Greenbriar lot by placing those assets in an irrevocable trust.

{¶ 117} In any event, given that the parties had acquired the marital residence and the lot during the marriage using marital funds, we recognize that the trial court potentially could have treated the value of those assets as marital property subject to division, as in *Kim*, even though the real estate itself was held by a third-party irrevocable trust. We need not resolve that issue definitively, however, because that is not what occurred. Unlike

*Kim*, the trial court directly awarded Shery the marital residence and the Greenbriar lot, while ordering David to take all necessary steps to convey those properties to her.

**{¶ 118}** We conclude that the trial court erred as a matter of law in its disposition of the marital residence and the lot. In *Guagenti*, the Third District recognized that an irrevocable trust "is an independent third-party entity and that assets held by such a trust are not property owned by either spouse, but rather property owned by a third party." (Citations omitted.) *Guagenti,* 2017-Ohio-2706, at ¶ 70.  That being so, there are no steps David personally can take to convey the marital residence and the Greenbrier lot to Shery. Those properties are owned by another entity, namely The Oakes Residence Trust, which was not a party to the divorce case.

**{¶ 119}** This court considered a similar scenario in *Maloney v. Maloney*, 2005-Ohio-1368 (2d Dist.), which involved a husband's claim to part of the increased value of a trust corpus of which his wife was a beneficiary. We reasoned:

> R.C. 3105.171(A)(3)(a) defines marital property in the broadest terms to include any property that either spouse currently owns or "has." However, even if the court had found that Linda "has" an interest in the corpus of the trust of which she is a beneficiary, the court could not order her to pay any part of the increase in the value of the trust to Joseph because she lacks that power and authority. The power and authority to do that are reserved to the trustee, Jim Cook, who is not a party to this action. He might have been joined for that purpose pursuant to Civ.R. 75(B)(1) as a "person . . . having possession of . . . or claiming an interest in property .

. . out of which a party seeks a division of martial property," but he was not so joined.

*Id.* at ¶ 56.

**{¶ 120}** As in *Maloney*, a transfer of the marital residence and the Greenbrier lot from the irrevocable trust to Shery would need to be performed by the trustee. We note, however, that neither The Oakes Residence Trust nor David, in his capacity as trustee, was made a party to the divorce proceeding. "Courts will find that a defendant is sued in his capacity as trustee if a complaint identifies the defendant as a trustee either in the caption or in a factual allegation." *Spencer v. Spencer*, 2018-Ohio-4277, ¶ 48 (11th Dist.). Shery's divorce complaint did not name David as trustee in the caption or in factual allegations. Therefore, the irrevocable trust and its trustee were not parties to the action. *Compare UAP-Columbus JV326132 v. Young*, 2012-Ohio-2471, ¶ 19 ("Because neither Wells Fargo nor UAP sued Young in his capacity as trustee, the owner of the Woodridge property is not a party in this litigation.").

**{¶ 121}** The trial court recognized the foregoing defect but faulted David. It reasoned that David, as trustee, could have sought intervention as a third-party defendant and could have interpleaded The Oakes Residence Trust. *See* Civ.R. 75(B). In his personal capacity, however, David argued that the marital residence and lot were neither marital property nor separate property owned by one spouse. He maintained that they were owned by another legal entity, the irrevocable trust. David was not the party seeking to have the residence and the lot equitably divided as marital property despite Shery's previously having gifted them to an irrevocable trust for asset-protection purposes.

Therefore, David had no reason or obligation to assist Sherry by moving to be made a party-defendant in his capacity as trustee and interpleading The Oakes Residence Trust. *See MacAlpin v. Van Voorhis*, 1981 WL 3787, *2 (11th Dist. Sept. 28, 1981) ("Clearly, if any duty or responsibility is imposed, it is on Nancy V. Taylor, Trustee, who, as was stated earlier, was neither named nor served as a party defendant. . . . In her personal capacity, Nancy V. Taylor had nothing to defend. There was no reason for her to assist the plaintiff by moving to be made a party defendant, as trustee."). David's duties as trustee did "not include voluntarily subjecting [himself] to suit in that capacity when [he] was sued merely as an individual[.]" *Id.* at *4.

{¶ 122} For the foregoing reasons, we hold that the trial court erred in awarding Shery real property owned by The Oakes Residence Trust, a separate entity that was not a party to the divorce case, and in directing David personally to facilitate transfer of the marital residence and the Greenbriar lot to her. Based on the authority set forth above, the trial court may possess discretion to treat the value of the home and the lot as a marital asset without actually ordering David in his personal capacity to facilitate its conveyance. But, again, that is not what occurred. Therefore, we will leave it to the trial court and the parties on remand to determine the proper disposition of the real estate in light of our analysis herein. David's second assignment of error is sustained.

{¶ 123} David's third assignment of error states:

**THE TRIAL COURT ERRED WHEN IT FOUND IN ITS DECISION AND DECREE OF DIVORCE THAT SHERY OAKES' INVESTMENTS IN WINE COLLECTIONS (BOTH IN OHIO AND FRANCE), JEWELRY,**

**EXPENSIVE WATCHES, AND EXTENSIVE ART COLLECTIONS ARE PERSONAL PROPERTY SUBJECT TO DIVISION PURSUANT TO MONTGOMERY COUNTY DOMESTIC RELATIONS LOCAL RULE 4.40(C)(1).**

**{¶ 124}** David contends the trial court erred in finding that marital investments in wine, jewelry, watches, and art were personal property subject to division under a coin-flip provision in Mont. D.R. Rule 4.40(C)(1). David characterizes these items as "alternative investments." He maintains that they fell outside of the local rule, which he argues applies to "run-of-the-mill household goods and furnishings."

**{¶ 125}** By its terms, Rule 4.40 covers the division of "[m]arital household goods, furniture, furnishings, appliances, tools, and other tangible personal property." If the parties cannot agree to the disposition of such property, Rule 4.40(C)(1) provides: "The parties shall flip a coin with the winner having first choice of one item, the loser having second choice, and the parties alternating selections until all items in dispute are divided." With the exception of two specific gifts that were not marital property, the trial court ordered the parties to divide their personal property—including a collection of wine, jewelry, watches, and art—using the coin-flip method. It reasoned that such a disposition was the only "equitable and efficient" manner of distribution "[g]iven the magnitude of the inventory of marital assets."

**{¶ 126}** Applying the cannon of statutory construction ejusdem generis, David argues that Local Rule 4.40 applies to "other tangible personal property" of the same kind, type, or class as the specified items, which included marital household goods, furniture,

furnishings, appliances, and tools. He reasons that the parties' extensive collections of wine, jewelry, watches, and art are "alternative investments" and are not in any way analogous to traditional marital household goods that may be divided by coin-flip disposition under Local Rule 4.40.

{¶ 127} Even if we accept David's construction of the rule, we see no prejudice resulting from the trial court's dispositional order. In the proceedings below, David hired an experienced personal-property appraiser, Amelia Jeffers, who assigned a fair-market value to each item in the collections. Under Local Rule 4.40, the parties will take turns selecting those items. Although David suggests that Shery may have a better understanding of "the market," Jeffers assigned a value to each item and the coin-flip process will award him roughly half of the value. When questioned on that issue by the trial court, Jeffers proffered testimony and agreed that the parties could "do the math and come up with a relatively equitable distribution of the property" as of December 2020, the date used to value the marital estate. Under these circumstances, we see no abuse of discretion in the trial court's dispositional order. David's third assignment of error is overruled.

{¶ 128} David's fourth assignment of error states:

**BASED UPON ANY ONE OR MORE OF THE FOREGOING ASSIGNED ERRORS, THE TRIAL COURT ERRED, FURTHER, WHEN IT CONCLUDED IN ITS DECISION AND DECREE OF DIVORCE, PURSUANT TO THE COURT'S EQUALIZATION OF ASSETS, THAT DAVID OAKES OWES SHERY OAKES $28,952,397.50 TO EQUALIZE**

**THE PARTIES' TOTAL ASSETS, DEBTS, AND LIABILITIES.**

{¶ 129} In his final assignment of error, David contends our sustaining of any of his first three assignments of error would render the trial court's ordered $28,952,397.50 equalization payment to Shery mathematically incorrect and, therefore, an abuse of discretion.

{¶ 130} In our analysis of Shery's appeal above, we determined that she was entitled to security for the judgment against David. With regard to the amount of that judgment, we found that the trial court had abused its discretion in valuing the marital residence and in basing its valuation of David's interest in Brantwood Development on a finding that the city's payments to the company could not increase over time.

{¶ 131} In our analysis of David's first three assignments of error, we found that the trial court had erred in awarding Shery real property owned by The Oakes Residence Trust and in directing David personally to facilitate transfer of the marital residence and the Greenbriar lot to her. We also held that the trial court had failed to address whether Alan Duvall's growth and net-income projections erroneously failed to take into consideration the cost of that growth and a relative lack of marketability.

{¶ 132} On remand, the trial court's resolution of the foregoing issues likely will impact the amount of David's equalization payment to Shery. Consequently, the trial court's order in the divorce decree obligating him to pay her $28,952,397.50 will be vacated pending resolution of the issues identified above. Because the trial court's order for a $28,952,397.50 equalization payment must be vacated, we overrule David's fourth assignment of error, as moot, as it challenges the amount of the vacated equalization-

payment order.

## IV. Conclusion

{¶ 133} The trial court's judgment is affirmed in part and reversed in part. The judgment is reversed insofar as the trial court failed to order any security for David's nearly $29 million financial obligation to Shery. Although we are vacating that ordered equalization payment, Shery remains entitled to some form of security for whatever payment the trial court ultimately orders David to make.

{¶ 134} The trial court's judgment also is reversed insofar as it (1) valued the marital residence at $5 million absent evidentiary support, (2) valued Brantwood Development, LLC, based on a finding that periodic payments to the company could not increase over time, and (3) awarded Shery real estate owned by an irrevocable trust and directed David personally to facilitate transfer of the real estate to her. Finally, the trial court's order for David to pay Shery $28,952,397.50 over a seven-year period is vacated. On remand, the trial court shall consider and determine whether Alan Duvall's growth and net-income projections failed to take into consideration the cost of that growth and whether Duvall's analysis contained a discount for Leadwise's relative lack of marketability. In resolving each of the foregoing issues, the trial court remains free to hear additional testimony, take additional evidence, or adopt any procedure it deems appropriate. In all other respects, the trial court's judgment is affirmed.

. . . . . . . . . . . . .


WELBAUM, J. and HUFFMAN, J., concur.